# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | |
|---|---|
| TANNER CORLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| vs. ) | |
| ) | **JURY DEMAND** |
| Mercedes Benz U.S. International, ) | |
| Inc., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Comes now the Plaintiff in the above-captioned cause, by and through undersigned counsel, and brings this action under 42 USC §1981 against Mercedes Benz, U.S. International, Inc.:

### JURISDICTION & VENUE

1. This action is brought pursuant to federal question jurisdiction by and under, 28 U.S.C. §1331.

2. Plaintiff Tanner Corley resides in Tuscaloosa County, Alabama, which is situated in this Court's jurisdiction.

3. Defendant Mercedes Benz U.S. International, Inc. is a company incorporated under the laws of Alabama, whose principle place of business is situated in Tuscaloosa County, Alabama, which is within this Court's jurisdiction.

1

PARTIES

4. Plaintiff Tanner Corley [hereafter: "Plaintiff" or "Corley"] is an adult individual over the age of nineteen (19) years of age who resides in Tuscaloosa County, Alabama.

5. Defendant Mercedes Benz U.S. International, Inc. [hereafter: "Defendant" or "MBUSI"] is a business incorporated under the laws of Alabama.

STATEMENT OF FACTS

6. Plaintiff was employed by MBUSI from around June 2014 through July 2019.

7. Plaintiff worked on MBUSI's assembly line at its Vance, Alabama, vehicle manufacturing plant and was qualified to do his job.

8. Plaintiff is white.

*The Assembly Line Incident with Darryl Holley*

9. During or around the last week of June 2019, while working at Station 17 in MBUSI's plant, Plaintiff noticed incorrect parts on several vehicles on the assembly line. As his job duty requires, he notified his Team Leader by radioing the Team Leader, notifying him of the situation, and saying it needed to be fixed. The Team Leader, corrected the problems with the vehicles affected. Normal production resumed.

10. Moments later, Darryl Holley [Holley], from Work Station 13, approached Plaintiff in Station 17. MBUSI policy, training and training videos tell employees not to leave their work stations, but Holley did anyway.

11. The incorrect parts problem originated from Holley's team or station.

12. Holley said something sarcastic or confrontational to Plaintiff, although Plaintiff cannot recall the exact words. To Plaintiff, Holley appeared angry; angry at Plaintiff for Plaintiff's stopping the line to get the incorrect parts problem resolved.

13. Plaintiff responded to whatever it was Holley said, referring to Holley's Team: "Can y'all not read the Broadcast Sheet?" or words to that effect. Broadcast Sheets tell assembly line employees what parts need to be used for production, what parts go on which vehicles as they move down the assembly line.

14. Plaintiff does not recall Holley answering his question. Plaintiff recalls seeing Holley storming back to his station and as he did, Holley angrily tearing one or more fender flares from vehicles moving down the assembly line. What Holley did violated MBUSI policies.

15. Plaintiff recalls no other employees or contractors near him and Holley during Holley's outburst at Plaintiff or Plaintiff's single-question response, at least none within earshot of them.

16. Holley's team was made up of both black and white Team Members,

MBUSI employees. Holley is black.

17. Plaintiff understands that when Holley's returned to Work Station 13, he asked his, Holley's, Group Leader, Adam Weeks, to let him go see Human Resources (HR).

18. Later that day, HR called-in Plaintiff and told Plaintiff to provide a statement of what happened. He did, and added to it at the end of his shift.

19. On or around that same day, Holley told several MBUSI Team Members he reported Plaintiff to HR for being "racist" or saying a "racist" statement to him. In fact, Plaintiff said nothing remotely racist to Holley.

20. A few weeks later, on or about July 23, 2019, Plaintiff's Group Leader told him he needed to meet again with HR. When he went to HR Plaintiff was told MBUSI was suspending him from work pending further investigation. Over the next several days, Plaintiff followed-up, checking-in daily with HR.

21. By August 1, 2019, Plaintiff feared he was being fired. He sent a text message to "Team Relations Manager" Jack Duncan [Duncan] asking to know the reason he was being terminated. Human Resources Manager David Olive [Olive] and Duncan telephoned Plaintiff and told Plaintiff MBUSI was firing him because MBUSI claimed Plaintiff made a "racist" statement to Holley.

22. Plaintiff had not made a racist statement to Holley.

23. It was Holley and MBUSI who/which imbued a race-neutral statement

with racism.

24. MBUSI perpetrated a racist act against Plaintiff, creating a racist incident where none occurred, then using that to fire Plaintiff.

25. MBUSI failed or refused to conduct a proper and thorough investigation into Holley's complaint and the circumstances surrounding it.

*MBSUI's Lawyer's Advice*

26. After the telephone call from Olive and Duncan, Duncan sent Plaintiff a follow-up text, letting him know that he, Plaintiff, could also "reach out" to MBUSI In-House lawyer Steven Nichols [Nichols] for further explanation.

27. Nichols is, in fact, In-House lawyer, associate counsel, for and employed by MBUSI.

28. As associate counsel, Nichols is authorized to speak on behalf of MBUSI on and regarding legal matters.

29. As associate counsel, Nichols had knowledge of the facts and circumstances leading up to and surrounding Plaintiff's termination.

30. Nichols is familiar with federal employment-related discrimination law.

31. As associate counsel, part of Nichols' routine job duties include and require his having knowledge of MBUSI employment decisions.

32. Plaintiff telephoned Nichols, and they briefly discussed the earlier telephone call between Olive, Duncan and Plaintiff in which MBUSI's representatives confirmed Plaintiff's firing, and confirmed the firing was due to race. During their telephone conversation, Plaintiff questioned the reason and/or motives behind's MBUSI's decision to terminate him.

33. During the aforementioned telephone conversation, Plaintiff asked Nichols whether he, Plaintiff, could appeal HR's decision to fire him. Nichols told Plaintiff he did not know, but would call Plaintiff the next day.

34. Plaintiff waited for Nichols' call throughout most of the next workday, on or around August 2, 2019, and finally telephoned and got Nichols on the line.

35. Nichols told Plaintiff no appeal was possible, that MBUSI provided Plaintiff no appeal right or peer review for a race-based termination.

36. Plaintiff asked Nichols, "Well if this was *you*, if you were in my shoes, what would *you* do?" or words to that effect.

37. Nichols responded to Plaintiff's question by telling Plaintiff if it were him, Nichols, "*I* would get a lawyer," or words to that effect.

38. Plaintiff took and understood Nichols' advice to mean that he should take legal action; that Nichols, too, considered Plaintiff's termination to be wrongful, but that his, Nichols', hands were tied.

39. Plaintiff does not know whether Nichols' statement was a slip of the

tongue, a momentary pang or upsurge of conscience, or concrete advice on how to right a wrong; only that (a) Nichols corroborated and admitted Plaintiff was fired based on race; that, (b) Nichols appeared to believe MBUSI was wrong; and, (c) he gave Plaintiff practical advice about the situation at hand and Plaintiff followed it.

40. On August 3, 2019, Plaintiff received his termination letter from MBUSI's Jack Duncan (it was dated July 31, 2019, but postmarked August 1). The letter said MBUSI was firing Plaintiff for being, "threatening, abusive or insulting;" but on the same day the letter was sent, August 1, 2019, Olive and Duncan told Plaintiff the reason for his firing was race as it related to Holley's and Plaintiff's late-June encounter.

41. The termination letter was a pretext. Over the telephone Olive and Duncan admitted MBUSI's decision was race-based and in his second of two telephone conversations with Plaintiff, Nichols underscored that Plaintiff was fired based on race.

42. About one (1) year earlier, in June 2018, a member of MBUSI's Senior Management stated that any employment-related decision was not about doing right or wrong, but, rather, "whether you can defend it."

43. The admission made by MBUSI set forth in the preceding Paragraph 42 evidences MBUSI's cynical, bad faith, and/or dishonest corporate philosophy when it comes to overall employment-related decision-making.

## *What Plaintiff's Other African American Co-workers Think*

44. By August 3, 2019, Plaintiff was in shock hearing he'd been fired for a "racist" according to Olive and Duncan; upon hearing MBUSI's own associate counsel advise him to get a lawyer; then when he received a letter telling him he'd "threatened, abused or insulted" Holley.

45. Plaintiff contacted by text six or eight of his now-former co-workers / Team Members and asked them whether they thought he'd said anything "racist" or otherwise wrong to Holley.

46. A half-dozen or more of Plaintiff's former MBUSI Team Members replied to him by text / message. None of his former Team Members agreed with MBSUI's firing decision. None of them considered what Plaintiff had said to be racist or wrong.

47. Plaintiff's African American former Team Members' texts back to him included the following (paragraphs 47*[a]*-*[d]*):

    47*[a]*.    "I see no racism behind that. I never thought you were racist. I hate you lost your job over something like that. Crazy."

    47*[b]*.    "I think it was wrong, Tanner. You are a good person. . . You were doing your job."

47*[c]*.   "That's not right [you getting fired] because I wouldn't consider that a racist statement. I can see Darryl [Holley] doing something like that. He's said way worse and no one has done anything. . . "

47*[d]*.   "No it doesn't sound racist because I['m] having the same issue on final [production]. I ask them that same question, can y'all read a broadcast sheet?"

48.   Plaintiff emphasizes that the foregoing paragraphs 47*[a]-[d]* are all texts from from former Team Members, all of whom are black. There are more texts in a similar vein sent to Plaintiff by several of his black former co-workers.

49.   The foregoing, quoted text messages demonstrate MBUSI's failure or refusal to adequately investigate Holley's allegations of "racism," and its refusal to come to grips with what occurred between Holley and Plaintiff.

50.   Instead, MBUSI branded and stigmatized Plaintiff as a racist in order to fire him; it ratified and endorsed Holley's race-based slander against Plaintiff.

51.   MBUSI's termination letter, unlike the accusations and admissions made by Olive and Duncan (and Holley), does not mention racism. The termination letter demonstrates an admission that MBUSI knew it was wrong to brand Plaintiff a racist, while attempting to cover-up its race-based decision with a nevertheless defamatory accusation, a writing that contradicted Olive's and

Duncan's own words, and Holley's repeated statements to other MBUSI Team Members.

### *Sham Investigation before Termination*

52.   MBUSI's "investigation" of Holley's complaint -- an "investigation" that lead to Plaintiff's termination -- was dishonest, not race-neutral, not conducted in good faith and, in fact, was a sham.

53.   Holley and Plaintiff Tanner Corley gave statements, but MBUSI's HR Department refused to talk with other Team Members on Plaintiff's team who could and would have backed-up Plaintiff and discredited Holley.

54.   MBUSI's HR Department, Olive and Duncan, deliberately ignored the plain language of Plaintiff's single, solitary, good and reasonable question -- "Can y'all not read the Broadcast Sheets?" or a question to that effect -- and chose to infuse it with racism and to use race to fire Plaintiff.

55.   An honest, race-neutral, good faith investigation would have disclosed Holley's gloating to others on his team that he was getting Plaintiff fired for "race" or "racism," indicating Holley's own bad faith, as well as MBUSI's dishonesty for refusing to conduct a fair, even-handed investigation.

56.   At MBUSI a black employee may ask another black employee whether or not his team can read the Broadcast Sheets, but a white employee will get fired for asking the same, innocuous, reasonable, race-neutral question.

57. On MBUSI's main assembly floor a person can find 1,000+/- employees working on any given shift.

58. On a weekly, if not daily, basis, arguments and disputes that include language as or much more "threatening, abusive or insulting" than Plaintiff's question to Holley are not unusual.

59. MBSUI used the "threatening, abusive or insulting" excuse to fire Plaintiff as a pretext to cover its actual reason: Because Plaintiff was white, had done his job responsibly, but that that had angered Holley, an African American employee and, MBUSI reasoned the white employee must go.

60. An honest, race-neutral, good faith investigation would have exonerated Plaintiff.

61. An honest, race-neutral, good faith investigation would have included interviewing Plaintiff's black team members, the ones who worked with him daily and knew him best.

62. During their August 1, 2019, telephone conversation, Olive and Duncan told Plaintiff MBUSI would provide him a copy of his written statement given, but, in the end, reneged on that pledge and never provided him with a copy of his statement. This also contributes to a showing of MBUSI's bad faith and malicious intent in conducting an "investigation."

### *MBSUI's Race-based Double-standards*

63.   On the day Holley complained to MBUSI HR about Plaintiff, Holley abandoned his work station and walked several stations over to confront Plaintiff. Although this is a serious violation of MBUSI policy, MBUSI did not discipline, let alone fire, Holley.

64.   On the day Holley abandoned his work station and walked several stations over to confront Plaintiff, MBUSI policy forbade "behavior that disrupts work, or creates a hostile environment." Although this is a serious violation of MBUSI policy, MBUSI did not discipline, let alone fire, Holley.

65.   On the day Holley abandoned his work station and walked several stations over to confront Plaintiff, MBUSI policy admonished its Team Members to create a "safe working environment." Although Holley's abandoning his work station ran counter to creating a safe working environment, MBUSI did not discipline, let alone fire, Holley for this.

66.   On the day Holley abandoned his work station and walked several stations over to confront Plaintiff, MBUSI policy informed its employees that if they had "concerns, questions or comments that affect. . . the working environment or themselves, [then] the Group Leader, Manager or Senior Manager of the department should be contacted." Holley violated this policy and, instead, sought-out a confrontation with Plaintiff. MBUSI did not discipline, let alone fire, Holley

for this policy violation.

67.     On the day Holley abandoned his work station and walked several stations over to confront Plaintiff, MBUSI policy stated: "The first and most effective method of resolving concerns is for you to have an open discussion with your immediate supervisor." Holley violated this policy, choosing instead to abandon his station and confront Plaintiff for doing his, Plaintiff's, job. MBUSI did not discipline, let alone fire, Holley for this violating this policy.

68.     When Plaintiff askied Holley whether or not his team could read the Broadcast Sheets, Holley stormed away angrily, tearing one or more fender flares from vehicles as they moved down down the assembly line. Plaintiff told HR about Holley's vandalizing or damaging MBUSI property (which was a serious violation of MBUSI policy), but MBUSI did not discipline, let alone fire, Holley for this violation.

69.     MBUSI chose not to discipline Holley for his policy violations set forth in the foregoing paragraphs 63-68, but, instead, fired Plaintiff for asking Holley a reasonable, legitimate, race-neutral question. This demonstrates MBUSI's race-based decision-making perpetrated against Plaintiff.

*MBUSI's Discriminatory Intent*

70.     MBUSI's    aforementioned    acts    and    omissions    regarding    its

intentionally incomplete, bias, sham, investigation of the core incident and issues between Holley and Plaintiff, and its adverse employment actions taken against Plaintiff, demonstrate race-based disparate treatment of and discriminatory intent towards Plaintiff, especially compared to Holley.

71. MBUSI's aforementioned acts and omissions surrounding its decision to fire Plaintiff based on race -- i.e., that a white MBUSI employee is prohibited from asking a race-neutral question to a black employee who's confronted his white co-worker -- constituted a race-based adverse employment action, as well as disparate treatment of and discriminatory intent towards Plaintiff.

72. MBUSI's aforementioned acts and omissions surrounding its double-standards in how it treated Holley [a black employee, for multiple, indisputable violations of MBUSI policies], compared to firing Plaintiff [firing him for (a) doing his job, and (b) asking Holley a race-neutral question when Holley abandoned his work station to confront Plaintiff], constitutes race-based adverse employment actions against, disparate treatment of, and discriminatory intent towards Plaintiff.

73. MBUSI's aforementioned acts and omissions *in toto* show that racial animus towards Plaintiff was a motivating factor, moving force, otherwise influenced its employment decisions and/or otherwise made a difference in MBUSI's treatment of and decisions made regarding Plaintiff.

74.     MBUSI's disparate treatment, adverse employment actions and other aforementioned discriminatory acts and omissions have proximately caused Plaintiff to suffer stress, frustration, humiliation, anxiety, loss of income, loss of future income, loss of benefits and other related privations.

## COUNT I

### 42 USC §1981

75.     By this reference Plaintiff Tanner Corley reiterates and incorporates all allegations set forth in preceding paragraphs, as if fully set forth herein.

76.     For purposes of 42 USC §1981, MBUSI and Plaintiff had an employer-employee relationship.

77.     MBUSI subjected Plaintiff to different terms and conditions of employment because of his race, white.

78.     MBUSI took adverse employment actions against Plaintiff because of his race, white.

79.     MBUSI's acts and omissions violated 42 USC §1981.

80.     Plaintiff has lost his job, back pay, front pay and benefits, all proximately caused by MBUSI's aforementioned intentional discriminatory acts and omissions.

81.     Plaintiff has suffered stress, frustration, humiliation and anxiety, all

proximately caused by MBUSI's aforementioned intentional discriminatory acts and omissions.

## REQUESTS FOR RELIEF

Following trial by jury, Plaintiff Tanner Corley respectfully requests the Court enter judgment in his favor in an amount to be determined by jury for:

A.  Back pay, front pay (future earnings), compensatory damages for loss of benefits, and all proximately caused and foreseeable costs and expenses Plaintiff has and will continue to suffer.

B.  Compensatory damages for stress, frustration, humiliation, anxiety and other mental anguish.

C.  Punitive damages.

D.  Injunctive relief in the form of an Order requiring MBUSI to revisit and revise its policies, procedures, training and supervision regarding workplace discrimination, investigating allegations of racism, avoiding race-based (or other) double-standards in employment terms and conditions, communicating with clarity and respect to its employees ("Team Members") during the course and at the conclusion of Human Resources and/or legal office workplace misconduct investigations.

E.  Reasonable costs and attorney's fees.

F.   Any other relief in law or equity the Court may find due to be awarded.


Respectfully filed and served on this, the 27th day of August, 2019.

_____
Richard R. Newton  (NEW032)
Attorney for Plaintiff Tanner Corley
1203 Regal Avenue
Birmingham, AL  35213
Tel:  205.356.2498
Email:  richardrussellnewton@gmail.com
ASB 0776-W85R


DEFENDANT MBUSI SERVED BY CERTIFIED MAIL TO ITS REGISTERED AGENT:

Rick Clementz
Mercedes-Benz U.S. International, Inc.
1 Mercedes Drive
Vance, AL  35490

_____
Richard R. Newton  (NEW032)
Attorney for Plaintiff