FILED
2021 May-21  AM 09:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| TANNER CORLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:19-cv-01400-LSC |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OF OPINION

## I.   INTRODUCTION

Plaintiff Tanner Corley ("Plaintiff" or "Corley"), a Caucasian male, brings this action against his former employer, Defendant Mercedes Benz US International, Inc. ("Defendant" or "MBUSI"). Corley asserts claims against MBUSI for race discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

Before the Court is MBUSI's Motion for Summary Judgment (doc. 47). This motion is fully briefed and ripe for review. For the reasons stated below, MBUSI's motion is due to be granted.

## II.   BACKGROUND[1]

Corley was employed by MBUSI, most recently as a Team Member on the Final 3 Line in Assembly 2 on the B-Shift. The Final 3 Line has different zones, each of which has stations where Team Members perform vehicle assembly tasks.

MBUSI has a hierarchy for its production teams. Team Members are assigned to a Team Leader. Group Leaders supervise Team Members and Team Leaders. Group Leaders are supervised by Managers. Corley was under the supervision of Group Leader Adam Weeks ("Weeks"), a Caucasian male.

MBUSI has a detailed handbook which is provided to all Team Members. This handbook covers MBUSI's policies and procedures regarding racial harassment, discipline, and grounds for termination. MBUSI's handbook also contains an explanation of the corrective performance review ("CPR") policy for workplace violations of company policies and procedures. Employees who commit certain workplace violations are subject to either a CPR—which is categorized as Level 1, 2,

---

[1]     The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .")

or 3—or termination. Corley received a Level 1 CPR in 2015 for using his cellphone while on the production line. Corley received a Level 3 CPR in 2017 for "engaging in horse play and promoting or participating in work slowdowns or interference with company operations." (Doc. 49-1 at 42.)

MBUSI may forgo issuing a CPR and proceed with termination for offenses "so serious, severe, or unacceptable that [they are] outside the realm of a corrective performance review." (Doc. 56-5 at 4.) MBUSI considers the use of "threatening, abusive, or insulting language or conduct" as severe enough behavior to warrant termination. (*Id.* at 5.) Before MBUSI issues a disciplinary decision, MBUSI considers the following: the "[s]eriousness of the action"; if there were any "[c]ontributing circumstances"; the employee's previous work record; what "[a]ctions [were] taken with other [Team Members] in similar situations"; "intent"; the impact the incident had "on fellow [Team Members] and/or business interests"; and any other "relevant factors." (*Id.* at 5–6.)

MBUSI views racially offensive statements as violative of their policy against abusive and insulting language. MBUSI previously terminated an African-American Team Member for calling another African-American Team Member the "N" word. Corley claims that MBUSI does not always terminate employees for racially offensive conduct, stating that Danny Diaz ("Diaz"), a Hispanic Group Leader, had

complaints from African-American employees and was not terminated. One of the Team Members who complained about Diaz was Darryl Holley ("Holley"), an African-American male. African-American employees, including Holley, believed that Diaz communicated with them in a degrading manner and alleged they he treated them differently from Caucasian employees; however, these employees did not contend that Diaz made racially offensive statements. MBUSI conducted an investigation and concluded that Diaz did not treat African-American employees differently from Caucasian employees, nor did he "use[] any racial slurs or [make] any racist statements." (Doc. 56-6 at 2.) Thus, MBUSI did not terminate Diaz's employment.

On June 25, 2019, Corley was working in Zone 4 when he noticed a quality defect in the assembly of parts coming from Zone 3. Corley followed the proper procedure and reported his observations to the Zone 3 Team Leader, Meaker Stewart ("Stewart"), an African-American male. Shortly thereafter, Holley, a Team Member in Zone 3, came to review the parts. Holley had previously received Level 1, 2, and 3 CPRs for violating MBUSI's attendance policy.

Corley states that Holley made a "smart comment" to him while he was examining the parts. (Doc. 57-1 at 47.) Corley responded to Holley, although the exact language of his response is disputed. Corley said either "I didn't know y'all

can read," (doc. 49-3 at 39) or something to the effect of "can y'all not read the broadcast sheet" (doc. 57-1 at 48). Corley states that he was referring to the Zone 3 Team when he said "y'all," and that the broadcast sheets provide assembly instructions for the Team Members. Holley felt this statement was racially offensive because African-Americans "couldn't—wasn't allowed to read back in the day." (Doc. 57-6 at 96.) Holley reported this incident to his Group Leader, who was also Weeks. Weeks reported the incident to Human Resources ("HR") to investigate.

William Harden ("Harden"), an African-American male, was an HR Team Relations Specialist who had experience investigating claims of race-related harassment at MBUSI. Harden was tasked with investigating the Holley/Corley incident. Holley filled out a complaint form, claiming that Corley created a racist, hostile environment. Harden then interviewed two witnesses to the incident, who heard Corley say "you all can't read" (doc. 57-3 at 24) and "I didn't think y'all could read" (doc. 49-1 at 63). Harden also had Corley file a statement recounting this incident, in which he reported he said "why don't you just read the broadcast sheet." (Doc. 49-11 at 64.)

After Harden concluded his investigation, he submitted his report to his manager, Jack Duncan ("Duncan"), a Caucasian male, to review. Harden subsequently informed Corley that he was suspended pending a further

investigation. Duncan concluded that Corley's statement was racially offensive and recommended to David Olive ("Olive"), a Caucasian male Senior HR Manager, that Corley be terminated. This recommendation of termination was consistent with MBUSI's policies and procedures regarding offensive and abusive language. Olive agreed with Duncan's assessment, determining that Corley's statement was racially offensive and that termination was appropriate. Corley challenges this conclusion, stating that Olive made his determination without gathering statements from other Team Members who did not view Corley's statement as racially charged, and without asking Corley what his intent was when he made the statement. When asked about the circumstances regarding Corley's termination, Olive testified as follows:

> **Olive**: We determined that making a statement to Mr. Holley that can't y'all read was offensive. And based on that, yes, it is a fireable [offense].

> **Question**: And how is that offensive, sir?

> **Olive**: Making a statement to an African-American who complained to us that he was offended by the statement and the reference to y'all in regards to Mr. Holley, we determined that to be offensive and racial.

> **Question**: So it was a race-based firing then?

> **Olive**: Correct.

(Doc. 57-2 at 105–06.) After Olive concluded that termination was appropriate, Corley's termination was approved by the Vice President of Administration, Rolf

Wrona, a Caucasian male. Corley was informed that the reason for his termination

was that he said "I didn't know y'all could read" to an African-American employee.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact[2] and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a

whole could lead a rational trier of fact to find for the nonmoving party." *Hickson*

*Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as

to a material fact exists "if the nonmoving party has produced evidence such that a

reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth*

*Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (quoting *Waddell*

*v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge

should not weigh the evidence, but should determine whether there are any genuine

issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).

In considering a motion for summary judgment, trial courts must give

deference to the nonmoving party by "view[ing] the materials presented and all

---

[2]      A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and a "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## IV.    DISCUSSION

Corley brings two claims against MBUSI for disparate treatment based on race. MBUSI has moved for summary judgment on both claims. Title VII prohibits,

among other conduct, "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998). Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Id.*

Absent direct evidence of racial discrimination, such as specific statements made by the employer's representatives, a plaintiff may demonstrate circumstantial evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981). Under this framework, the aggrieved employee creates a presumption of unlawful discrimination by first establishing a *prima facie* case of discrimination. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). The burden then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Burdine*, 450 U.S. at 253). If the employer proffers a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the employer's reason is a pretext for unlawful discrimination. *Crawford v. Carroll*, 529

F.3d 961, 976 (11th Cir. 2008). Although the *McDonnell Douglas* framework is one way of showing discriminatory intent, it is not the only way to show discriminatory intent in a Title VII or § 1981 discrimination claim. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* As Title VII and § 1981 claims are analyzed in the same manner, the Court will address both claims together.

## A.   *McDonnell Douglas* Framework

Corley asserts that he was discriminated against because of his race when MBUSI terminated his employment. Corley further asserts that he has direct evidence of discrimination, thus he need not rely upon the *McDonnell Douglas* framework to establish a *prima facie* case of discrimination. "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989). "Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999) (quoting *Merritt v. Dillard Paper Co.* 120 F.3d 1181, 1189 (11th Cir. 1997)).

The "direct evidence" to which  Corley refers is Olive's deposition testimony. After being asked a poorly phrased question regarding Corley's termination, Olive responded that it was "race-based"; however, Olive's testimony, when read in context, does not support the conclusion that Corley was terminated because of *his* race, but rather that he was terminated for making a "race-based" statement. Olive's testimony does not support that Corley was terminated because he is Caucasian without inference or presumption, as required for evidence to be considered direct evidence. As Corley has provided no direct evidence that MBUSI terminated his employment because of his race, the Court proceeds to use the *McDonnell Douglas* burden-shifting framework to evaluate Corley's circumstantial evidence. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

### 1.  Prima Facie *Case*

To establish a *prima facie* case for wrongful termination, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was terminated; and (4) he was replaced by an individual outside of his protected class or he was treated less favorably than similarly situated individuals outside his protected class. *See Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). To satisfy the fourth prong of the *prima facie* case, the proffered comparator must be similarly situated to the plaintiff "in all

material respects." *Lewis*, 918 F.3d at 1226. As the Eleventh Circuit has explained, "a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. While the precise "similarity" is "to be worked out on a case-by-case basis," a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor"; and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28.

It is undisputed that Corley satisfies the first three prongs of a *prima facie* case.[3] The parties dispute whether Corley has provided any similarly situated comparators to satisfy his *prima facie* case.[4] Corley provides two comparators: Holley and Diaz.[5] However, neither comparator is "similarly situated" to Corley under *Lewis*. Holley and Corley were both Team Members under the supervision of Weeks and subject to the same employment policy. However, Holley and Corley did not

---

[3]    As this is a case of "reverse discrimination," the fact that Corley is Caucasian satisfies the first element of his *prima facie* case. *See Smith*, 644 F.3d at 1325 & nn. 15–16.

[4]    Corley does not argue that he was replaced by a Team Member from outside of his protected class; therefore, the Court only discusses whether Corley has provided any similarly situated comparators.

[5]    To the extent that Corley suggests Duncan is a similarly situated comparator, this argument must fail. Duncan is also Caucasian; therefore, he cannot be a similarly situated comparator as he is not outside of Corley's protected class.

share a similar disciplinary history, nor did they engage in the same type of misconduct. Holley's disciplinary history involved CPRs for violating MBUSI's attendance policy, whereas Corley's disciplinary history involved CPRs for using his cellphone on the production line and for engaging in horseplay. Furthermore, Corley has not presented any evidence that Holley had engaged in the same alleged misconduct—making racially offensive statements. Corley remarked that Holley made a "smart comment" to him during their confrontation, but Corley did not report this comment as racially offensive to MBUSI, nor does he argue before this Court that it was a racially offensive statement. Accordingly, Holley is not similarly situated to Corley in all material respects.

Concerning Diaz, he was not a Team Member, but rather he was a Group Leader in a different section from Corley. Thus, Diaz was under different supervision from Corley, albeit subject to the same employment policy. Additionally, Corley presents no evidence to suggest that Diaz engaged in the same or similar misconduct. Complaints filed by African-American employees did not allege that Diaz made any racially offensive statements. The complaints concerning Diaz focused on his rough manner of communication and a perceived difference in treatment between African-American employees and Caucasian employees. However, after an investigation into the reports, MBUSI concluded that Diaz did

not treat African-American Team Members differently from Caucasian Team Members. Furthermore, Corley does not provide evidence that Diaz had a similar disciplinary history. While Diaz is outside of Corley's protected class, Corley has not provided evidence that he is similarly situated in all material respects.

In sum, Corley has not met his burden to provide a similarly situated non-Caucasian comparator who made a racially offensive statement and was treated differently from Corley. As Corley has not provide any similarly situated comparators, he has not stated a *prima facie* case of discrimination. Accordingly, MBUSI's motion is due to be granted.

## 2. *Legitimate Nondiscriminatory Reason*

Even if Corley had stated a *prima facie* case of discrimination, MBUSI argues that it had a legitimate, nondiscriminatory reason for terminating Corley's employment. MBSUI contends that Corley was terminated because he made a racist statement, "I didn't know y'all could read." Considering this statement in light of the circumstances, MBUSI concluded that the statement violated their policy against abusive and insulting language. Corley argues that MBUSI cannot use this as a legitimate, nondiscriminatory reason for his termination because Corley believes the fact that he was terminated for allegedly making the statement is in itself a discriminatory reason. The Court disagrees. MBUSI has met its exceedingly light

burden. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) ("[T]he employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). While Corley may maintain that he was treated unfairly by MBUSI, that does not change the fact that MBUSI has provided a legitimate, nondiscriminatory reason for terminating his employment. As MBUSI has met its burden of production, the burden shifts back to Corley to demonstrate that MBUSI's reason was pretextual.

### 3. *Pretext*

Corley does not argue that MBUSI's reason for terminating him was pretextual for discriminating against him based on race. Instead, Corley argues "this case does not need pretext," because he believes that MBSUI does not have a legitimate, nondiscriminatory reason for his termination. (Doc. 55 at 34.) As the Court finds MBUSI did provide a legitimate, nondiscriminatory reason for Corley's termination, it is Corley's burden to demonstrate this reason was pretextual for discriminating against him because of his race. A "plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated

the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256). In determining whether the proffered reason is pretextual, courts are not in the "business of adjudging whether employment decisions are prudent or fair," but rather "whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Again, Corley has not argued and has not presented any evidence that MBUSI's reason for terminating his employment was pretextual. Thus, even if Corley had stated a *prima facie* case of race discrimination, MBUSI's motion is due to be granted because Corley failed to demonstrate MBUSI's reason for termination was pretextual.

### B.   *Bostock v. Clayton County*

Corley argues that the *McDonnell Douglas* burden-shifting framework is inapplicable in light of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). In *Bostock*, the Supreme Court held that "[a]n employer who fires an individual merely for being gay or transgender defies the law" as that employment decision inherently takes into consideration an individual's sex. *Id.* at 1754. The Court made no ruling on the applicability of the *McDonnell Douglas* framework. Rather, the Court examined the statutory text of Title VII, and discussed

what it means to be discriminated against "because of" a protected characteristic, and what constitutes "but for" causation. *Id.* at 1739–40, 1743.

The *McDonnell Douglas* framework is an evidentiary framework to help courts determine whether a plaintiff has submitted sufficient evidence to create a triable issue of fact to submit to a jury. The Eleventh Circuit has continued to apply the *McDonnell Douglas* burden-shifting framework to analyze Title VII claims post-*Bostock*, as have other circuits. *See, e.g.*, *Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 488 (11th Cir. 2020) (per curiam)[6]; *see also Riney v. Lockheed Martin Corp.*, 831 F. App'x 698, 701–02 (5th Cir. 2020) (per curiam); *Henderson v. Mass. Bay Transp. Auth.*, 977 F.3d 20, 29–30 (1st Cir. 2020); *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020); *Black v. Grant Cnty. Pub. Util. Dist.*, 820 F. App'x 547, 550 (9th Cir. 2020). There is no authority to support Corley's position that *Bostock* abandoned the *McDonnell Douglas* framework for Title VII claims; therefore, this Court continues to apply traditional methods of analyses to Corley's claims.

---

[6] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

## C.     Race as a Motivating Factor

Corley also asserts that his race was a motivating factor in MBUSI's decision to terminate his employment.[7] To succeed under a mixed-motive theory of liability, a plaintiff must show "that illegal bias, such as bias based on [race], 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting 42 U.S.C. § 2000e-2(m)). This can be accomplished by presenting either direct or circumstantial evidence of discrimination. *See id.* (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–102 (2003)). But it is inappropriate to use the *McDonnell Douglas* burden-shifting framework to evaluate mixed-motive claims at summary judgment. *Id.* at 1238. Instead, "[t]o avoid summary judgment, a plaintiff raising a mixed-motive claim must offer 'evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [him]; and (2) a protected characteristic was *a* motivating factor for the [employer's] adverse employment action.'" *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364

---

[7]     The Court notes that Corley merely states what the legal standard is for mixed motive claims in his response brief. He does not proceed to make a discrete argument as to why his claims should move forward under this this theory. However, it appears to the Court as if Corley has scattered his mixed motive argument throughout other sections in his response brief. And, MBUSI responded to Corley's argument in its reply brief. Thus, the Court will also address Corley's claims under a mixed motive theory of liability.

(11th Cir. 2018) (quoting *Quigg*, 814 F.3d at 1239). "In other words, the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [his protected characteristic] was a motivating factor for [an] adverse employment decision.'" *Quigg*, 814 F.3d at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)).

It is undisputed that Corley suffered an adverse employment action, thus the only issue is whether his termination was in part motivated by his race. Corley has not presented any evidence from which a reasonable jury could conclude that he was terminated in part because he is Caucasian. Corley focuses on what his intent was when he made the statement. He argues that MBUSI didn't fairly consider whether Corley intended the statement to be race-neutral, asserting that this demonstrates he was discriminated against because of his race. MBUSI challenges this, asserting that MBUSI could determine Corley's intent based on his statement to Harden. And, contrary to Corley's contention, a dispute as to his state of mind when making the statement is not a question that must be determined by a jury. This is not relevant in a race discrimination case, where the inquiry is framed differently—did the employer intentionally discriminate against an employee in part because of that employee's race. An employer may terminate an employee for "a good reason, a bad reason, a

reason based on erroneous facts, or for no reason at all." *Flowers v. Troup Cnty, Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). An employer is merely prohibited from terminating an employee because of that employee's protected characteristic. *See id.*

Regardless of whether MBUSI sufficiently delved into Corley's intent during its investigation, or whether other employees felt Corley's statement was not racist, the law requires Corley to present evidence from which a reasonable jury could conclude that MBUSI engaged in impermissible discrimination against him at least in part because of *his* race. Corley has not done so. It is clear to the Court that Corley believes he was treated unfairly, and that he believes MBUSI gave undue deference to Holley's complaint; however, it is not the role of the Court to determine whether MBUSI's decision was fair. *See Damon*, 196 F.3d at 1361. The Court's role is to determine if Corley has provided evidence to create a triable issue of fact as to whether his race was a motivating factor in his termination, which he has not.

Accordingly, MBUSI's motion is also due to be granted under a mixed-motive theory of liability.

## V.   CONCLUSION

For the reasons stated above, MBUSI's Motion for Summary Judgment (doc. 47) is due to be granted. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on May 21, 2021.

L. Scott Coogler
United States District Judge

202892